A99A0576. SHADIX et al. v. CARROLL COUNTY et al.

(521 SE2d 99)

POPE, Presiding Judge.

On August 11, 1998, Lawrence Shadix and the Carroll County Association of Taxpayers brought an action for declaratory judgment and injunctive relief to stop Carroll County and the State Revenue Commissioner, Jerry Jackson, from collecting a special purpose local option sales tax ("SPLOST"). The court denied the injunctive relief, found in favor of the defendants, and Shadix and the plaintiffs appealed. For the following reasons, we conclude that the court erred, and we reverse.

On July 13, 1993, the Carroll County Board of Commissioners passed a resolution calling for submission to the voters for approval of a referendum for the imposition of a special purpose county sales and use tax. See Ga. L. 1992, pp. 2998, 3005; OCGA § 48-8-111. The specified purposes for which the proceeds were to be used included funding road, street, and bridge projects, as well as funding fire protection, recreation, water, sewer, and jail projects.[1]

Under the authority of the resolution, the Chairman placed the referendum as to whether to impose a one percent SPLOST on the November 2, 1993 ballot. The language on the referendum ballot strictly conformed with the statutorily prescribed form. See Ga. L. 1992, p. 3003, § 1 (d) (3). The ballot read:

SPECIAL ELECTION 1 PERCENT SALES AND USE TAX REFERENDUM[.] A YES vote means you favor a 1 percent sales and use tax[.] A NO vote means you oppose a 1 percent sales and use tax[.] Shall a special 1 percent sales and use tax be imposed in Carroll County for the raising of not more than $34,000,000 for a period of time not to exceed four (4) years, for paving, resurfacing, traffic control and improvement to the system of Roads, Streets and Bridges within the

---

[1] The Commission Chairman was authorized by the resolution to enter into an intergovernmental agreement with various Carroll County municipalities to complete the specified capital improvement projects according to priorities set by the parties. On September 22, 1993, the intergovernmental agreement regarding the capital outlay projects to be funded by the proposed tax became finalized. See Ga. L. 1992, pp. 2998, 2999-3000, § 1 (a) (1) (D); OCGA § 48-8-111 (a) (1) (D). In addition to Carroll County, eight municipalities were parties to the agreement. The intergovernmental agreement described in detail all of the capital outlay projects and their respective costs.

county; and for a period of time not to exceed five (5) years for the purpose of funding capital improvements relating to fire protection services, recreational facilities, public buildings and water and sewerage projects within the county and its respective municipalities? ( ) YES ( ) NO

On November 2, 1993, the referendum was held and more than one-half of the votes cast were in favor of imposing the SPLOST. The State Revenue Department confirmed receipt of the referendum results to impose the SPLOST and notified the Carroll County Board of Commissioners that the tax would be effective on April 1, 1994.

As of May 21, 1998, $34,009,170.16 had been collected by the State Revenue Commissioner pursuant to the SPLOST. Through the June 1998 distribution, the Commissioner distributed revenues pursuant to the SPLOST to Carroll County in the amount of $34,285,209.62. In August 1998, Shadix, a resident of Carroll County, and a taxpayers group from Carroll County filed the complaint for declaratory judgment and injunctive relief, asserting that the SPLOST terminated when $34 million was raised. The State Revenue Commissioner, the Carroll County Tax Commissioner, Jean Matthews, and Carroll County filed answers and then briefs, claiming that the five-year period specified in the ballot was controlling for collection of the tax and that the tax collection should continue for five years, regardless of the amount of money raised.

The parties and the trial court agreed to resolve the case on an expedited basis with stipulated facts and affidavits and to hold an accelerated final hearing on the merits on September 1, 1998. Before the hearing, the trial court held a conference during which plaintiffs' counsel announced that he was filing an amendment to the complaint to add Counts 4, 5, and 6; plaintiffs' counsel told the court that the amendment did not change plaintiffs' theory of the case. Plaintiffs also sought additional discovery from the defendants. The court directed the defendants to provide the key factual information needed by the plaintiffs in lieu of formal discovery. The trial court heard the merits of the case from all parties. At the conclusion of the hearing, the parties completed and filed their stipulations.

On September 4, 1998, the court rendered final judgment, finding that the SPLOST terminated at the end of the day on March 31, 1999, and that the other issues in the amended Counts 4, 5, and 6 were either moot, without merit as a matter of law, or did not otherwise warrant judicial relief. Plaintiffs filed their notice of appeal to the Supreme Court; the Supreme Court denied an emergency motion for escrow of such taxes pending appeal. After docketing, the Supreme Court transferred the appeal to this Court.

1. Plaintiffs contend that the trial court erred in denying injunc-

tive relief to stop the continued collection of the SPLOST and in deciding the declaratory judgment adversely to them. We agree.

We first examine the issue of mootness with respect to the questions raised regarding the termination of the tax. It is established that

> [a] petition for declaratory judgment will not lie where all rights of the parties have already accrued and where no facts or circumstances are alleged showing a necessity for adjudication in order to relieve the plaintiff from the risk of taking future undirected action, which, without such action, would jeopardize the plaintiff's interest.

(Citations and punctuation omitted.) *Kelly v. City of Atlanta*, 217 Ga. App. 365, 367 (2) (457 SE2d 675) (1995), overruled on other grounds, *Atlanta Independent School System v. Lane*, 266 Ga. 657 (1) (469 SE2d 22) (1996). Moreover, "as a general rule, a suit for injunctive relief regarding the collection of allegedly illegal taxes should not be entertained by the courts if the taxes at issue have been substantially collected and disbursed." 217 Ga. App. at 367 (2). Nevertheless, due process requires that redress be available when taxes have been collected unlawfully. See, e.g., *Reich v. Collins*, 513 U. S. 106 (115 SC 547, 130 LE2d 454) (1994); OCGA § 48-2-35.

In this case, it is not clear whether the substantive issues regarding the injunctive and declaratory relief which plaintiffs sought in the original complaint have become moot. The trial court's order stated that the tax would end on March 31, 1999. Although a consent order in the case was entered during the pendency of the case which stated that Carroll County "until further order of the Court" would not "spend any amount in excess of $34 million from the money raised by the special 1 percent sales and use tax," no such staying order was entered after the Court's final judgment. Moreover, as stated above, the parties filed an emergency motion for escrow of such taxes pending appeal, which the Supreme Court denied. In their stipulated facts, the parties agreed that "as of September 1, 1998, $36,183,787.99 had been collected by the State Revenue Commissioner pursuant to the Tax." The stipulation further provided that as of that date "Carroll County had received $35,821,950.11 from the money collected by the State Revenue Commissioner pursuant to the Tax." It is not clear from the record whether the additional money raised by the tax has been disbursed to the county, nor is it clear whether the county has spent the additional revenue. Moreover, there are issues to be resolved in this appeal which are dependent on our resolution of the merits of the underlying action. As discussed below, the trial court's determination

regarding the termination of the tax was improper. Upon remand, the court should make a factual finding as to whether the collected taxes have been spent and, if so, should direct the parties accordingly.

The General Assembly has enacted a detailed Code Article authorizing counties to impose a special one percent sales and use tax. See OCGA § 48-8-110 et seq. Subject to the requirement of referendum approval and other requirements, the governing authority of any county may impose such a tax, for limited periods of time, for one or more statutorily authorized purposes. See OCGA §§ 48-8-110; 48-8-111.

The dispute in this case arose because of ambiguity in the applicable statute. The statutory scheme left a "gap" with respect to the termination date for a mixed use SPLOST. Under the version of OCGA § 48-8-112 (b) in effect before April 14, 1997, a SPLOST that was solely for purposes other than roads, streets, and bridges (a "non-road" tax) and that did not require a debt validation terminated: (i) at the end of the calendar quarter in which it was determined the specified maximum amount of the revenue was raised; or (ii) on the final day of the five-year maximum period of time, whichever came earlier.

Nevertheless, the statute was unclear with respect to a mixed purpose SPLOST — in other words, a tax to be used for both "non-road" and road purposes like the tax involved here. OCGA § 48-8-112 (b) (3), which terminated the tax when the specified maximum amount of revenue was received, purported to apply only to a *non-road* tax. Subsection (b) (2), which was not limited to non-road taxes, set the limitation solely on the basis of the specified period of time.

Despite the lack of specific statutory guidance, various of the article's provisions show that the legislature intended that a mixed use SPLOST terminate when the maximum amount specified in the ballot was raised. OCGA § 48-8-111 (a) (3), which sets out general procedures for the imposition of a tax, provides that when a county votes to impose a tax, the county election superintendent shall be notified and that the resolution or ordinance shall specify "[t]he maximum cost of the project or projects which will be funded from the proceeds of the tax, which maximum cost shall also be the maximum amount of net proceeds to be raised by the tax." OCGA § 48-8-111 (d) (3) specifically required a ballot for a mixed purpose tax to designate the maximum amount to be raised. Clearly, this section would be incongruous if, regardless of the inclusion in the ballot of the maximum amount to be collected, the tax could be collected in excess of this amount.[2]

---

[2] Carroll County, but not the voters, was aware of the "gap" in the statute and sought

Moreover, OCGA § 48-8-121 (a) (3) provided that proceeds of a mixed purpose tax could be collected and used for both road and non-road purposes for the entire five years, so long as the total expenditures were consistent with that provided in the original resolution. Again, this section implied that the tax would terminate when the specified maximum amount was collected.

In 1997 the General Assembly amended OCGA § 48-8-112 (b) (3) specifically to apply to all SPLOST taxes, including mixed purpose taxes. Under the revised statute all SPLOST taxes clearly terminate when the maximum amount is raised. Ga. L. 1997, p. 519, § 1. This change pertained only to resolutions adopted on or after April 14, 1997, and does not resolve the question raised in this case.

The maximum amount of proceeds to be raised from the tax was a fundamental part of the tax referendum on which the Carroll County taxpayers voted. The language of the tax referendum provided that the tax would raise no more than $34 million over a period of no more than four years for purposes related to roads, streets and bridges, and for a period of no more than five years for the purpose of funding certain capital improvements. Stated differently, the voters approved a tax which would end within four and five years, *or* upon the collection of $34 million dollars. In so voting, the taxpayers approved only a limited collection of money.

Our conclusion that the county was bound to terminate the tax when the maximum amount stated in the ballot was raised is bolstered by the general principle that when a revenue statute lacks clarity, it must be construed against the taxing authority. "[I]f a statute levying taxes is not clear and positive as to its terms, or if it is open to various interpretations through indefiniteness of its provisions, it is to be construed most strongly against the government and in favor of the citizen." *Thompson v. Ga. Power Co.*, 73 Ga. App. 587, 597 (37 SE2d 622) (1946); see also *Fulton Metal Bed Mfg. Co. v. State Revenue Comm.*, 52 Ga. App. 159, 161 (2) (182 SE 803) (1935). The meaning of a revenue statute cannot be extended by implication. *Novak v. Redwine*, 89 Ga. App. 755, 757 (81 SE2d 222) (1954).

Through the mechanism of the SPLOST, the General Assembly allowed its sovereign power to tax and collect to be employed by a county so that it could collect a special, *consented-to* tax for constitutionally permitted purposes. See generally *City Council of Augusta v. Mangelly*, 243 Ga. 358, 362 (254 SE2d 315) (1979). The Carroll County voters consented to the collection of *no more* than $34 million for the designated purposes. The voters did not consent to the collec-

legal advice from the State Law Department before the referendum. An attorney in the department opined that the County could continue the tax because OCGA § 48-8-111 did not specify a termination date when the tax was collected for mixed purposes.

tion of additional money, and accordingly, the court erred in denying injunctive relief because the county was obligated to cease its taxation when this limitation was reached. See generally *Dickey v. Storey*, 262 Ga. 452, 456 (3) (423 SE2d 650) (1992) (Board of Commissioners was not authorized to use proceeds from the SPLOST tax for a purpose entirely different from that contained in original resolution). Based on our conclusion, we will not address plaintiffs' constitutional arguments in this regard.

2. Plaintiffs contend that the court's grant of summary judgment on Counts 4, 5, and 6 of their amended complaint was improper. They also argue that the court erroneously disallowed discovery on these counts.[3]

In Count 4, plaintiffs sought injunctive relief to halt the expenditure of money raised after April 1, 1998, on roads. Count 5 sought injunctive relief for the ongoing improper spending of the excess proceeds of the tax in violation of OCGA § 48-8-121 (g) (2). Count 6 sought relief for the county's breach of statutory record-keeping requirements. In its order, the trial court concluded that because of its conclusion that the time period was controlling as to the limitation of the tax, the counts of plaintiffs' amended complaint were moot or without merit.

As stated above, we cannot determine whether the county has spent the money raised by the tax or not. If the money has not been disbursed, then Count 4 can be properly dealt with by the court, given our conclusion in Division 1. Similarly, in light of our conclusion in Division 1, the court should have allowed Count 5 of the amended complaint.

The trial court should also have allowed plaintiffs to amend by adding Count 6, regarding the maintenance of records. OCGA § 48-8-121 (a) (1) provides in pertinent part:

> The proceeds received from the tax authorized by this article shall be used by the county exclusively for the purpose or purposes specified in the resolution or ordinance calling for imposition of the tax. Such proceeds shall be kept in a separate account from other funds of the county and shall not in any manner be commingled with other funds of the county prior to the expenditure.

Similarly, OCGA § 48-8-121 (a) (2) imposes strict record keeping, scheduling, and auditing practices to account for all expenditures.

The County unlawfully collected the tax revenue that exceeded

---

[3] We reject plaintiffs' constitutional arguments since these arguments were neither presented properly here nor preserved below.

the $34 million cap and could not lawfully expend those funds. The court erred in not allowing plaintiffs to raise Count 6 regarding the County's maintenance of proper records. Although the County claims that it kept the requisite records, the court made no factual determination as to the correctness or adequacy of these records. Accordingly, on remand, the court should allow discovery so that a factual determination can be made as to whether the County kept the proper records, whether it properly disbursed the proceeds, and whether any excess proceeds were improperly expended. See *Dickey v. Storey*, 262 Ga. at 456 (3) (county must maintain financial records for each project for which tax proceeds are used).

*Judgment reversed and case remanded. Johnson, C. J., Blackburn, P. J., Smith, Barnes and Ellington, JJ., concur. Eldridge, J., dissents.*

ELDRIDGE, Judge, dissenting.

I respectfully dissent.

1. The trial court, on an undisputed evidentiary record by agreement of the parties, tried all of the issues in the case on the merits and entered a final declaratory judgment on the merits, which was adverse to the plaintiffs. OCGA § 9-11-65 (a) (2). Having decided the issues adversely to the plaintiffs as a matter of law, injunctive relief in equity was not appropriate. The legal questions were simple: (1) did the ballot language of the referendum determine when the SPLOST terminated or (2) did the statute authorizing the SPLOST provide the termination date?

Carroll County, through the State Revenue Commissioner, can collect a SPLOST or any other tax authorized by the Georgia Constitution or by law authorized under the Constitution. "A County can only exercise the power of taxation as conferred upon it either directly by the Constitution or by the General Assembly when authorized by the Constitution." (Citation and punctuation omitted.) *Chanin v. Bibb County*, 234 Ga. 282, 286 (216 SE2d 250) (1975); accord *DeKalb County v. Brown Builders Co.*, 227 Ga. 777, 778 (2) (183 SE2d 367) (1971); *Richmond County Business Assn. v. Richmond County*, 224 Ga. 854, 856 (165 SE2d 293) (1968); *Commrs. of Chatham County v. Savannah Elec. &c. Co.*, 215 Ga. 636, 637 (112 SE2d 655) (1960); Ga. Const. of 1983, Art. VII, Sec. I, Par. I; Art. IX, Sec. IV, Par. I. However, the tax imposed here was not under local ordinance, but under an act of the General Assembly, and was administered on behalf of the county and municipalities by the State Revenue Commissioner as a county tax.

In regard to the prescribed language of the referendum,

[t]he formula prescribed by the legislature was not intended

for the purpose of informing the voter as to the full contents of the [statute]. On the contrary, the formula was intended as the declaration by the voter of his approval or disapproval of the [SPLOST referendum,] which had been published [countywide]. The [SPLOST referendum] was submitted to the elector, and the formula prescribed was simply to elicit his expression as to whether or not the proposed [SPLOST] should become a part of the [county taxes]. The formula written or printed on his ballot was but the legislative means of obtaining his expression upon the published proposal; and when he adopted the formula he indicated his vote upon the whole [SPLOST] which was submitted, and not a mere part. [Cit.]

(Punctuation omitted.) *McLennan v. Aldredge*, 223 Ga. 879, 882 (1) (159 SE2d 682) (1968).

A referendum of the electorate consenting to a specific tax imposition is neither a law nor a constitutional authorization to tax; it confers no power to tax, in and of itself, but is merely a precondition. *McLennan v. Aldredge*, supra at 882. Such referendum vote by a majority of the electorate to the imposition of a SPLOST is the exercise of a condition precedent to impose a tax authorized by the constitution and by the General Assembly conditioned upon such prior consent, which can be conferred at any time. *Bd. of Commrs. of Taylor County v. Cooper*, 245 Ga. 251, 258-259 (4) (264 SE2d 193) (1980). The power to tax comes not from the referendum, but from the General Assembly by statute authorized by the constitution. Id. Therefore, the electorate can either agree or disagree to be taxed under the terms and conditions of the statutory authority, not the ballot. Once a referendum is conducted, such correct record and return of the vote are transmitted to the State Revenue Commissioner. OCGA § 48-8-111; see generally *Gwinnett County v. Bolin*, 262 Ga. 67, 69 (414 SE2d 225) (1992).

The descriptive caption to Ga. L. 1987, p. 1322, reads in part that its purpose is "to change provisions relating to the termination of the tax." Thus, in passing the enabling legislation to create a SPLOST, the General Assembly expressed the clear intent to set the termination date by the statute and not by the language of the referendum ballot. Ga. L. 1987, pp. 1322, 1329-1330, § 2; OCGA § 48-8-112. The General Assembly amended this act in Ga. L. 1992, pp. 2998, 3001, § 1, to provide that in the proposed ordinance the termination dates of such taxes were

[f]our years for roads, street, and bridge purposes and five years for purposes other than road, street, and bridge pur-

poses if the proceeds of the tax are to be used in part for road, street, and bridge purposes and in part for purposes other than road, street, and bridge purposes for which the tax may be imposed.

OCGA § 48-8-111 (a) (2), which fixed the termination date under OCGA § 48-8-112 (b) (2) by passage of time only. When read in pari materia with Ga. L. 1985, pp. 232, 237-238, § 1 (OCGA § 48-8-112 (b) (2) and (3)), all combined purposes, as in this case, terminated "[o]n the final day of the maximum period of time specified for the imposition of the tax," i.e., five years. Ga. L. 1992, pp. 2998, 3001, § 1 (OCGA § 48-8-111 (a) (2)). In contrast, where the purpose did not include a combination of roads, streets, and bridges and other purposes, i.e., "mixed purpose," the termination date was "as of the end of the calendar quarter during which the commissioner determines that the tax will have raised revenues sufficient to provide to the county net proceeds equal to or greater than the amount specified as the maximum cost of the project." Ga. L. 1985, pp. 232, 238, § 1 (OCGA § 48-8-112 (b) (3)). Clearly and unambiguously, the statutes provided that a combined or mixed purpose SPLOST terminated based upon time and not based upon maximum tax receipts. Such termination provisions were clear and unambiguous whether for a single or mixed use purpose contrary to the majority's position; there was no "gap" for mixed use SPLOST. See Ga. L. 1985, pp. 232, 238, § 1; Ga. L. 1992, pp. 2998, 3001, § 1.

However, Ga. L. 1997, p. 519, § 1 changed the termination date again and provided under Code section 48-8-112 (b) (3) that the language "[i]f the tax was imposed other than for road, street, and bridge purposes" was removed so that such subsection now applied to all purposes, whether road, non-road, or combined. Further, in § 2 of that 1997 amendment, the General Assembly limited such provision to *prospective* application only;

> [n]otwithstanding any provision of Code Section 1-3-4.1 to the contrary, this Act shall become effective upon its approval by the Governor or upon its becoming law without such approval and shall apply with respect to taxes imposed or to be imposed under resolutions or ordinances *adopted on or after* said effective date.

(Emphasis supplied.) Ga. L. 1997, pp. 519, 520, § 2. Therefore, such amendment does not retroactively apply to the Carroll County SPLOST. In fact, the necessity of passing such amendment, which would bring about the result that plaintiffs urge if applied retrospectively, indicates that the General Assembly believed that the prior

statutory provisions, rather than the formula prescribed by the ballot, determined the date of termination.

Further, former OCGA § 48-8-112 (b) (2) provided that the tax would terminate "[o]n the final day of the maximum period of time specified for the imposition of the tax," which was five years. Ga. L. 1987, p. 1322, § 2. Under OCGA § 48-8-112 (b) (2), the Revenue Commissioner is under a statutory mandate to collect such tax until the termination date on March 31, 1999, five years after imposition. See generally *Cellular One v. Emanuel County*, 227 Ga. App. 197, 198-199 (489 SE2d 50) (1997).

The Supreme Court of Georgia, speaking of the ballot language for a constitutional amendment, stated, "we hold that the ballot language is not a proper subject for more than this minimal judicial review," because such ballot language is only to sufficiently inform the elector of the nature of the matter to be voted on in the referendum. *Sears v. State of Ga.*, 232 Ga. 547, 555-556 (4) (208 SE2d 93) (1974); see also *Goldrush II v. City of Marietta*, 267 Ga. 683, 686 (2) (b) (482 SE2d 347) (1997); *Donaldson v. Dept. of Transp.*, 262 Ga. 49, 51 (1) (414 SE2d 638) (1992); *Carter v. Burson*, 230 Ga. 511, 521-522 (5) (198 SE2d 151) (1973).

> It was within legislative discretion to adopt some formula by which the voter would express his assent or dissent to the [SPLOST]. . . . The formula written or printed on his ballot was but the legislative means of obtaining his expression upon the published proposal.

*Cooney v. Foote*, 142 Ga. 647, 654-655 (3) (83 SE 537) (1914); accord *Carter v. Burson*, supra at 522. The General Assembly, unlike Congress, has original and not delegated powers, which power is limited only by the state and federal constitutions. *Sears v. State of Ga.*, supra at 554.

> The inherent powers of our State General Assembly are awesome[, and it] is entrusted with the general authority to make laws at discretion. This is true of the Georgia Legislature, the legislature being within the pale of its constitutional competency, the paramount and sovereign power in the State, clothed by the people with all power except where they have made limitations. The legislature is absolutely unrestricted in its power to legislate, so long as it does not undertake to enact measures prohibited by the State and Federal Constitution.

(Citations and punctuation omitted.) Id. at 553-554. Thus, the General Assembly had the power to establish the termination date of a

SPLOST by statute regardless of the ballot language.

There was nothing ambiguous in the statute or its amendments regarding the termination date for a mixed purpose SPLOST. Since this was a combination of purposes project within the plain language of Ga. L. 1992, pp. 2998, 2999, 3001, § 1, OCGA § 48-8-111 (a) (1) (D) and (H) (2), and Ga. L. 1987, pp. 1322, 1329-1330, § 2, OCGA § 48-8-112 (b) (2), then the termination date was at the end of five years, which would be March 31, 1999. Where, as here, the language of the statute is plain and unequivocal, judicial construction is not only unnecessary but is prohibited. *City of Jesup v. Bennett*, 226 Ga. 606 (176 SE2d 81) (1970); *Thompson v. Ga. Power Co.*, 73 Ga. App. 587 (37 SE2d 622) (1946). The majority seeks to find ambiguity where there is none and fails to follow the rules of statutory construction. OCGA § 1-3-1 (a).

Thus, where the validity of a tax act is questioned, declaratory judgment is appropriate. See *Camp v. MARTA*, 229 Ga. 35, 36 (189 SE2d 56) (1972); *Martin v. Ellis*, 242 Ga. 340, 342 (249 SE2d 23) (1978). Since the trial court entered a final declaratory judgment on the merits adverse to the plaintiffs, then plaintiffs had an adequate remedy at law and were not entitled to injunctive relief. *Camp v. MARTA*, supra at 36; *Martin v. Ellis*, supra at 342; see also OCGA §§ 23-1-3; 23-1-4; *Cantrell v. Henry County*, 250 Ga. 822 (301 SE2d 870) (1983). Further, if equity jurisdiction did, in fact, exist and since the judgment was adverse to plaintiffs, then the trial court determined as a matter of public policy and balancing of the equities that plaintiffs were not entitled to an injunction. *Ledbetter Bros., Inc. v. Floyd County*, 237 Ga. 22 (226 SE2d 730) (1976); *Bradley v. Roberts*, 233 Ga. 114 (210 SE2d 236) (1974); *Milton Frank Allen Publications v. Ga. Assn. of Petroleum Retailers*, 223 Ga. 784, 788 (158 SE2d 248) (1967).

2. At the agreed upon hearing on the merits, plaintiffs raised for the first time Counts 4, 5, and 6 by filing an amended complaint. Plaintiffs agreed to proceed with the trial of all issues and failed to object, request a continuance, or request to submit evidence after the hearing. Therefore, any objection to consideration of such issues was not preserved for appeal. Plaintiffs never raised a constitutional issue as to notice that they must try such issues and present any evidence at the final hearing.

Further, such constitutional issues have not been properly framed, as follows: (1) the constitutional issues were not raised in writing in the trial court; (2) they were not specifically or with fair precision set forth as to which constitutional rights were implicated and in what way such rights were violated by the particular portion of the statute to raise a justiciable issue ripe for determination; (3) plaintiffs did not demonstrate standing; (4) such issues were not

raised at the earliest opportunity; and (5) the trial court has not passed upon such constitutional issues. Thus, such issues are not ripe for review. *Marchman & Marchman, Inc. v. City of Atlanta*, 250 Ga. 64 (295 SE2d 311) (1982); *St. John's Melkite Catholic Church v. Commr. of Revenue*, 240 Ga. 733, 734 (1) (242 SE2d 108) (1978); *Richmond Concrete Products Co. v. Ward*, 212 Ga. 773, 774-775 (95 SE2d 677) (1956), overruled on other grounds, *State of Ga. v. Crane*, 224 Ga. 643, 644 (164 SE2d 116) (1968).

Further, plaintiffs have waived or abandoned such issues under Court of Appeals Rule 27 (c) by failing to specifically reference the record or transcript regarding such enumerated errors. See *Henry v. Med. Center*, 216 Ga. App. 893, 894 (1) (456 SE2d 216) (1995); *Dugger v. Danello*, 175 Ga. App. 618, 620 (2) (334 SE2d 3) (1985).

3. Counts 4, 5, and 6 of the complaint sought injunctive relief in equity to impound the taxes collected after March 1998 and to compel the keeping of records as to such tax receipts and expenditures. An action for injunctive relief is to immediately prevent, stop, or reverse conduct causing irreparable harm. Therefore, it is an action to proceed in court without normal discovery to a temporary or interlocutory evidentiary hearing or an accelerated final hearing. OCGA § 9-11-65 (a) (2). Because such hearing is accelerated, the rules of evidence are relaxed.

Further, neither OCGA § 9-11-26 nor Uniform Superior Court Rule 5 grants parties any specified time for discovery to be conducted; the length of discovery rests in the sound discretion of the trial court. USCR 5.1 states:

> [i]n order for a party to utilize the court's compulsory process to compel discovery, any desired discovery procedures must first be commenced promptly, pursued diligently and completed without unnecessary delay and within six months after the filing of the answer. At any time, the court, in its discretion, may extend, reopen or shorten the time to utilize the court's compulsory process to compel discovery.

Thus, there is no specified time within which to conduct discovery, only a limitation on the period that the trial court will enforce discovery; by trial court order, discovery can be shortened or increased. *Alexander v. Macon-Bibb County Urban Dev. Auth.*, 257 Ga. 181, 184 (5) (357 SE2d 62) (1987); *Walton v. Datry*, 185 Ga. App. 88, 90 (1) (363 SE2d 295) (1987).

> A trial court has wide discretion to shorten, extend, or reopen the time for discovery, and its decision will not be reversed unless a clear abuse of that discretion is shown. *Stewart v.*

*Stewart*, 260 Ga. 812, 813 (400 SE2d 622) (1991); *Ambassador College v. Goetzke*, 244 Ga. 322 (260 SE2d 27) (1979), cert. denied, 444 U. S. 1079 (100 SC 1029, 62 LE2d 762) (1980).

*Woelper v. Piedmont Cotton Mills*, 266 Ga. 472, 473 (1) (467 SE2d 517) (1996).

The record shows that the parties agreed to proceed without discovery and the trial court required the evidence be produced or stipulated by the defendants in lieu of discovery so that these important public policy issues could be tried on the merits at the earliest date. Plaintiffs agreed to the factual stipulations and placed additional evidence into the record after the hearing. Plaintiffs made no objection in the trial court or attempt to engage in any discovery. Therefore, there is no evidence of an abuse of the trial court's discretion.

DECIDED JULY 16, 1999

*Gary P. Bunch*, for appellants.

*Thurbert E. Baker, Attorney General, Daniel M. Formby, Deputy Attorney General, David A. Runnion, Warren R. Calvert, Senior Assistant Attorneys General, David A. Basil*, for appellees.